IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                             :
UNITED STATES OF AMERICA,     :          Criminal Action
                             :
             Plaintiff,       :          No.  2:10-cr-00130
                             :               2:13-cr-00032
v.                           :
                             :          Date:  May 13, 2013
TERRY TOMBLIN,                :
                             :
             Defendant.       :
_____x
```

TRANSCRIPT OF REVOCATION & SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:          AUSA STEVEN I. LOEW
                             U.S. Attorney's Office
                             P.O. Box 1713
                             Charleston, WV  25326-1713

For the Defendant:           DEIRDRE H. PURDY, ESQ.
                             407 Jarvis Rd.
                             Chloe, WV  25235

Probation Officer:           Matthew Lambert
                             Jeff Bella

Court Reporter:              Ayme Cochran, RPR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    PROCEEDINGS had before The Honorable Thomas E. Johnston,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on May 13, 2013, at 1:35

4    p.m., as follows:

5         COURTROOM DEPUTY CLERK:  The matter before the Court is

6    the United States v. Terry Tomblin, criminal action numbers

7    2:10-130 and 2:13-32, scheduled for supervised release revocation

8    and sentencing.

9         THE COURT:  Good afternoon.  Will counsel please note

10   their appearances?

11        MR. LOEW:  Good afternoon, Your Honor.  Steve Loew for

12   the United States, and seated at counsel table is Special Agent

13   Rob Cunningham with ATF.

14        MS. PURDY:  Deirdre Purdy on behalf of the defendant,

15   Terry Tomblin, who is present in person.

16        THE COURT:  All right.  Good afternoon.

17     Mr. Tomblin, will you please stand, and I will ask the

18   deputy clerk to administer an oath to you at this time.

19        COURTROOM DEPUTY CLERK:  Please raise your right hand.

20             **TERRY TOMBLIN, DEFENDANT, SWORN**

21        COURTROOM DEPUTY CLERK:  Thank you.

22        THE COURT:  You may be seated.

23     I would also note for the record -- well, first of all, the

24   way I -- when I do these joint revocation/sentencing hearings,

25   I'll start out with the revocation proceeding up to a point and

1    then I'll switch over to the sentencing proceeding.

2         So, with regard to the revocation proceeding, I would note

3    that the defendant's probation officer, Mr. Jeff Bella is

4    present.

5         Mr. Tomblin, do you understand that you are now under oath

6    and you must tell truth and, if you answer any of my questions or

7    otherwise testify falsely, your answers may later be used against

8    you in another prosecution for perjury or for making a false

9    statement?

10                    THE DEFENDANT:  Yes.

11                    THE COURT:  All right.  On March 22nd, 2011, Mr.

12   Tomblin was sentenced to a term of five years of supervised

13   probation for his conviction of possession of hydrocodone by

14   misrepresentation, fraud, forgery, deception, and subterfuge in

15   violation of 21 U.S.C. Section 843(a)(3).  Mr. Tomblin began

16   serving his term of probation on that date.

17        On January 11th, 2013, Mr. Tomblin's probation officer filed

18   a petition for warrant under summons for offender under

19   supervision against Mr. Tomblin charging him with violating

20   certain conditions of his probation.  Specifically, the petition

21   alleges that Mr. Tomblin violated the following conditions of

22   probation, and they are:

23        First, the standard condition -- an alleged violation of the

24   standard condition which provides,"You shall not commit another

25   federal, state or local crime."  In support of this violation,

1 the petition alleges that on December 31st, 2012, the offender

2 was involved in a traffic stop and subsequently arrested by

3 members of the West Virginia State Police in Mud Fork, West

4 Virginia. A criminal complaint has been filed in Logan County,

5 West Virginia charging the offender with carrying a concealed

6 weapon, two counts of obstructing, driving left of center,

7 failure to dim headlights, no proof of insurance, no seatbelts

8 and no proof of registration.

9  Second, the petition alleges a violation of the standard

10 condition which provides that "You shall not possess a firearm,

11 ammunition, destructive device, or other dangerous weapon." In

12 support of this alleged violation, the petition alleges that on

13 December 31, 2012, the offender was stopped driving in Mud Fork,

14 West Virginia by members of the West Virginia State Police. The

15 offender was found to be in possession of a Glock model 20

16 pistol. The handgun was on the offender's person located in his

17 boot with his pant leg pulled down over the boot.

18  Third, the petition alleges a violation of standard

19 condition number 11, which provides, "You shall notify the

20 probation officer within 72 hours of being arrested or questioned

21 by a law enforcement officer." Excuse me. In support of this

22 violation, the alleged violation, the petition alleges that on

23 December 31, 2012, the offender was arrested by members of the

24 West Virginia State Police in Mud Fork, West Virginia. The

25 offender has not notified this officer of the arrest.

1    Mr. Tomblin, have you received written notice of the alleged

2    violations?

3         THE DEFENDANT:  Yes, sir.

4         THE COURT:  And, Ms. Purdy, has the evidence against

5    Mr. Tomblin been disclosed?

6         MS. PURDY:  Disclosed?

7         THE COURT:  Yes.

8         MS. PURDY:  Yes, Your Honor.

9         THE COURT:  And, Mr. Tomblin, do you understand that if

10   I determine that you have violated the terms and conditions of

11   your probation under the United States Sentencing Guidelines, I

12   may revoke, extend or modify your term of probation?

13        THE DEFENDANT:  Yes.

14        THE COURT:  And do you admit or deny the allegations

15   contained in the petition?

16        THE DEFENDANT:  Admit.

17        THE COURT:  All right.  Mr. Loew, in light of the

18   defendant's admission, does the government wish to present any

19   evidence?

20        MR. LOEW:  No, Your Honor.

21        THE COURT:  Ms. Purdy, does the defendant wish to

22   testify, present evidence, or call any witnesses?

23        MS. PURDY:  No, Your Honor.

24        THE COURT:  All right.  The Court finds that Mr.

25   Tomblin has received written notice of the alleged violations and

that the evidence against him has been disclosed.  Further, Mr. Tomblin has appeared, has been given the opportunity to present evidence, and has been represented in this proceeding by counsel.

The Court finds by a preponderance of the evidence that Mr. Tomblin violated the conditions of his probation as previously set forth.  In making this finding, the Court relies upon the information contained in the petition, as well as the defendant's admission.

Having found that Mr. Tomblin has violated the conditions of his probation, the Court must consider the advisory sentencing guidelines and the other applicable factors set forth in 18 U. S. C. Section 3553(a) and all other appropriate statutes, including 18 U. S. C. Section 3565, in determining what action is appropriate.

I would note -- well, first of all, with regard to the guidelines, pursuant to Guideline Section 7B1.1(b), the most serious violation is used to calculate the grade of Mr. Tomblin's probation violation and, accordingly, that would be a Grade B violation.  Mr. Tomblin's criminal history category for his original offense is a Category I.

Given a Grade B violation and a criminal history category of I, the Guideline custody range is 4 to 10 months.  However, the Fourth Circuit has held that the guidelines provided in Section 7B1.4 are advisory and not binding on the Court at revocation.

Beyond that, in turning to statutory provisions, 18 U.S.C.

1   Section 3565 governs revocation of probation.  Under Subsection

2   (a) of that statute, if the defendant violates a condition of

3   probation, the Court may continue the defendant on probation with

4   or without extending the term or modifying or enlarging the

5   conditions; or, two, revoke the sentence of probation and

6   re-sentence under sub-chapter A; in other words, go back to

7   basically square one with the sentencing as it was originally

8   available in terms of options in the underlying case.

9       I would also note that under Subsection (b) of Section 3565,

10  if the defendant is found to be in violation of his probation by

11  possessing a firearm, revocation and a prison term are both

12  mandatory.

13      So going back for a moment to the guidelines, if we go back

14  to a sentence under Subsection (a), then we have a guideline

15  offense range of 0 to 6 months, which is in Zone A of the

16  sentencing table.

17      The statute for Mr. Tomblin's original offense provides for

18  a maximum term of imprisonment of 48 months and a term of

19  supervised release of no more than 12 months and does either

20  party have any objection to the calculations I have set forth?

21          MR. LOEW:  No, Your Honor.

22          MS. PURDY:  No, Your Honor.

23          THE COURT:  All right.  The Court orders that Mr.

24  Tomblin's probation be revoked.

25      All right.  At this point, I'm going to shift over to the

1    sentencing proceeding.

2         All right.  Let's just clear this up now.  Would the

3    probation officers introduce themselves, please?

4              PROBATION OFFICER BELLA:  I'm Jeff Bella.  I'm doing

5    the revocation.  Matt Lambert is covering the sentencing portion.

6              THE COURT:  All right. All right.  Ms. Purdy, have you

7    received and read and reviewed with your client a copy of the

8    Presentence Report?

9              MS. PURDY:  I have, Your Honor.

10              THE COURT:  Mr. Tomblin, have you received and read and

11    reviewed with your counsel a copy of the Presentence Report?

12              THE DEFENDANT:  Yes, sir.

13              THE COURT:  And Mr. Loew, have you received and

14    reviewed a copy of the Presentence Report?

15              MR. LOEW:  Yes, Your Honor.

16              THE COURT:  All right.  I note that there are two

17    outstanding objections.  Well, before we get to that, I would

18    note that I've received a sentencing memo and a supplemental

19    sentencing memo from the defendant, as well as a memo from the

20    government, on the obstruction of justice enhancement issue.  I

21    also just today received a letter from Bishop Hartwell on behalf

22    of the defendant.  Have the parties seen that?

23              MR. LOEW:  I have not seen it, Your Honor.

24              MS. PURDY:  Yes, I saw it, Your Honor.

25              THE COURT:  All right.  Do you wish, Ms. Purdy, that it

1    be made a part of the record?

2              MS. PURDY:  Yes, Your Honor.

3              THE COURT:  Any objection?  Would you like to look at

4    it first?

5              MR. LOEW:  Yes, please.

6              THE COURT:  All right.

7              MR. LOEW:  May I approach?

8              THE COURT:  You may.

9         (Pause.)

10             MR. LOEW:  Thank you, Your Honor.  I have no objection.

11             THE COURT:  All right.  I will order that it be made a

12   part of the record for this proceeding.

13        All right.  Also, let's turn to the objections.  Let's start

14   with the obstruction of justice enhancement.  Ms. Purdy?

15             MS. PURDY:  The government originally moved for an

16   obstruction of justice enhancement for a number of reasons.  The

17   first one generally was a series of phone calls that the

18   defendant, Mr. Tomblin, had made to his wife from the jail in

19   which he asked his wife to talk to her sister about her statement

20   to the police.  Generally, that was the gist.  I don't expect

21   you've seen them, Your Honor, but he was concerned that the

22   statement wasn't right.

23             THE COURT:  Well, let me say something about the phone

24   calls.  I haven't listened to them because I have the

25   transcripts.

1    MS. PURDY:  Right.

2    THE COURT:  I did read the transcripts, although there

3    appeared to be a page missing from one of them, the first call,

4    and it was missing when it was filed because the sequence on

5    CM/ECF -- the page numbers on CM/ECF, the sequence is correct,

6    but there's one page missing from the first tape.  From what I

7    can tell, it's a part of a discussion that's not really at issue

8    in this matter, but at any rate, you -- I'm sorry I interrupted

9    you.

10    MS. PURDY:  That's just fine.  And the second generally

11    was that the defendant lied to the probation officer and the

12    arresting officers and when the -- the Assistant United States

13    Attorney when he was questioned about the matter of who the Glock

14    that he was arrested with belonged to.

15    The probation officer had an opportunity during the

16    continuance of this matter to look at the government's position

17    and the probation officer determined that he would not recommend

18    the obstruction of justice enhancement on the telephone

19    conversations, finding that the telephone conversations did not

20    essentially rise to the level of obstruction, that they were not

21    threatening or intimidating or ordering of any sort, but simply

22    asking his wife to talk to his sister.  That's the Probation

23    Department's position and I agree with that position.  It was a

24    position I put forward in a memo to the Probation Department.

25    The second part, however, is that -- or the second basis is

that the lies, which we agreed Mr. Tomblin was not truthful about

the ownership of the Glock or, at least since that's not clear

really, but at least how he came into possession of it, whether

he had anything to do with coming into possession of it, he spoke

falsely about those to everyone he spoke to, the probation

officer, the Assistant United States Attorney, and the arresting

officer.

The question, I believe, for the obstruction enhancement,

and we agree that's a lie and, in fact, we accept that he lost

credit for acceptance of responsibility for telling that lie.

Once we learned that that was not true, we withdrew our objection

to that loss of credit.

However, does that also rise to the level or is it, in fact,

obstruction?  I don't believe it is because obstruction, a lie, a

falsehood, must be material to some issues in this case and,

although he lied about whose gun it was or where he got the gun,

how he got the gun, that general issue, that is not an issue in

this case.  If believed, it would make no difference in this case

because he is a felon and he possessed a firearm and, whether the

firearm was his, his sister-in-law's, where he got it is

irrelevant to whether or not he's guilty and is not an issue in

this case and so, therefore, I hope the Court would find that

this is not obstruction because the lies, acknowledged

falsehoods, were not material to any issue in this case.

THE COURT:  Is one of the -- well, let me just hear

1    from Mr. Loew.

2           MR. LOEW:  Your Honor, first, I'll address this issue

3    of materiality.  Based on the admission that the statements were

4    false regarding the Glock, I think it's pretty obvious that it's

5    material towards the sentencing, which is one of the prongs where

6    a defendant can obstruct justice in the sentencing of his case.

7         So the question then to the Court is, is it material to you

8    in determining the appropriate sentence to know that under the

9    defendant's story, the Glock wasn't his, that his sister-in-law

10   bought it and it was hers; he had it for less than one day, and

11   only to clean it for her and make sure it was okay.  So under

12   that version, where's the -- where's the Court going to determine

13   how to sentence the defendant in a guideline range verse he had

14   his sister-in-law straw purchase the gun for him?  He provided

15   the money.  It was his gun that he was carrying concealed in his

16   boot on the exact same day that she got it and he thought it was

17   okay because he thought he had a valid concealed weapons permit.

18        So those are two very different stories that are going to

19   clearly affect the Court in the sentencing of this case, which is

20   one of the ways you can obstruct justice, is in your sentencing.

21   So it's clearly material.  It is about the very gun that he

22   possessed and that the Court has to determine the appropriate

23   sentence for him today.

24           THE COURT:  Well, before you move on to the phone

25   calls, is one of the things -- and I'm going back and looking at

1    the probation officer's recitation of the objection.  Well, for

2    this issue, I recall -- and I thought this was in the objections

3    portion of the addendum, but I can't find it now, is one of the

4    things at issue -- I thought that, at some point, Mr. Tomblin had

5    stated that he believed that because he had -- not only had a

6    concealed weapons permit, but had been sent an application to

7    renew the concealed weapons permit, that he believed that he was

8    permitted to have a firearm and not subject to a prohibition.  Is

9    that not part of this issue?

10        MR. LOEW:  Yes, I believe it is, Your Honor, and that's

11    part of -- that was in my memo, and that was something that

12    defense counsel conceded, and I can't remember if it was in her

13    first sentencing memorandum, or her second, regarding acceptance.

14        The defendant said exactly what the Court just repeated,

15    that he thought that it was okay for him to carry a concealed

16    weapon because he had a concealed weapons permit and he had just

17    gotten a renewal form when, in reality, what he got was a letter

18    from Logan County saying, "Your previous concealed weapons permit

19    is revoked because you're a convicted felon," and they said they

20    don't send renewals and they wouldn't have sent a renewal because

21    it wasn't time for a renewal anyway, and that is one of the

22    exhibits, those documents.

23        THE COURT:  Isn't that in the Presentence Report

24    somewhere, too?

25        PROBATION OFFICER LAMBERT:  Your Honor, that was in the

first final Presentence Report in regards to acceptance of
responsibility.  The obstruction of justice enhancement and the
objection to that were not in the first final Presentence Report.

MR. LOEW:  In the final Presentence Report, Your Honor,
it's Paragraph 44.

THE COURT:  All right.  I knew I didn't dream that up.
It was somewhere.

All right.  So -- so you say both these things are at issue,
and I'm presuming that you say that the concealed weapon permit
issue, also, is material?

MR. LOEW:  Well, I think those two together are
important because they're two very different stories.  I mean, if
it was true and the Court were to believe that the defendant
truly thought he had a concealed weapons permit because he got a
new one in the mail and he was confused, and he had the gun for
less than a day and he was only holding it for his sister-in-law
for the short period of time to make sure it was okay, that is
material verse what actually happened, and that is that he didn't
have a concealed weapons permit because it was revoked because
he's a felon and he lied about that and he had his sister-in-law
buying his own Glock that he had had for years, that he kept
using as essentially security for loans, to go back and forth to
get and, on the very day that he had his sister-in-law buy it,
he's carrying it in his boot and gets caught with it and then
lies about her straw purchasing the gun for him.  Those are two

very different stories that are clearly going to affect the
Court's decision and be material to the Court determining, you
know, the very important issue of where to sentence the
defendant, how to sentence him.

THE COURT:  Anything to add on the phone calls?

MR. LOEW:  Your Honor, I think the phone calls are
pretty clear.  The defendant is manipulative.  He's manipulating
his wife to stretch the truth on different issues, to forge some
documents for him, and he wants her to get with her sister to get
her story straightened out regarding the Glock.  Her story about
the Glock hurts him.

What does she need to get straightened out, unless it's to
make it better for him?  If it was good for him, we would just
leave it the way it was, but it's not good for him.  She straw
purchased the gun for him.  It was his money.  She went in and
bought it and immediately gave it to him.

That's not good for him.  That's why he wants her to get her
story straightened out.  It's pretty clear that he's trying to
influence her testimony on the very gun that he possessed and
that he's being sentenced for today.

THE COURT:  Well, I'm going to hear from Ms. Purdy.
I'm going to give you the last word, Ms. Purdy, but having looked
at the transcript, I do believe that the page I'm missing
probably is not particularly relevant to this issue based on the
context of -- leading in -- of the page leading into it and the

page leading out of it.

I think that the conversations on the tapes are a little troublesome, but I'm not prepared to give an enhancement based on those conversations, but -- so I'm going to take -- I'm going to take that off the table.

So, Ms. Purdy, I'll give you the last word on the materiality of these other things.

MS. PURDY: Of course, the issue of sentencing ultimately is always an issue and any lies relevant to the guilt or innocence or mitigating facts as the defendant might see them, I think, are also relevant, at least, to sentencing.

However, the issues of this sentencing, if he were being sentenced for a straw purchase, if he were charged with a straw purchase, then that would be clearly material. These lies would clearly be material.

But he's not being charged with a straw purchase. That's not what the case is that the government brought and, Mr. Tomblin is not only a lay person, but has not been able to get the law of gun possession through his head. I hope he finally has now. He did not, and he truly believed, I believe, that he -- quite wrongly, that he had a concealed weapons permit. He thought that his sister-in-law's story wasn't correct, because it wasn't in certain aspects, and he wanted her to get it straight.

The lie does not go to issues of that -- that determine what he is guilty of here, which will determine his sentencing. They

have not affected his relevant conduct, and the fact that he lied, although I understand it can go for more than one enhancement or loss of credit, does not affect issues material to this sentencing, and so I would ask that you find that, while egregious, it is not obstructive.

THE COURT: Well, I would -- if we were pre-*Booker*, I would probably agree that these things are not material because they wouldn't affect the guideline calculation and the advent of *Booker* and the -- excuse me -- the sentencing regime we've had now for about eight years, where the guidelines are advisory and we District Court judges have considerable discretion to sentence either within or outside of the guidelines and in which it's clear that consideration of the Section 3553(a) factors are front and center in the sentencing decision has changed things and, in most cases, that has changed things in a way that is generally beneficial to defendants because defendants now have a whole wide range of things they can argue, among other things, under Section 3553(a)(1), where the Court is to consider the nature and circumstances of the offense and the history and characteristics of the defendants.

Well, that is an extremely broad mandate that gives the opportunity, in most cases, for the defense to bring in a lot of particularly sympathetic information in mitigation that the Court may certainly, and should certainly consider as a part of a sentencing decision and, most of the time, that's the way it

1    works out.

2         However, this is a situation where it is not advantageous to

3    the defendant because if there is a defendant who is trying to

4    minimize his conduct by lying about what he did in a way that

5    might not otherwise be relevant to a guideline calculation, it is

6    certainly relevant to the consideration of the nature and

7    circumstances to the offense and the history and characteristics

8    of the defendant and there is no doubt that that -- to me, that

9    that is definitely touched upon when a defendant minimizes his

10   conduct.

11        When he tells a different story about how he got the gun, a

12   story that makes it sound about as innocent as it possibly can

13   for a convicted felon to have a gun, that's minimization.  That

14   is, in my view, material to Section 3553(a)(1), at least.

15        So, on that basis, I'm going to overrule the defendant's

16   objection and apply the obstruction of justice enhancement, but

17   again, not with regard to the phone calls.  I just don't -- those

18   phone calls are a little troublesome, but they're vague enough

19   and I'm just not convinced.  I'm with the probation officer on

20   that.  There's not quite enough there for me to make an

21   obstruction finding, but there is on these other matters that I

22   have discussed.

23        So, all right.  Now we'll move on to the objection with

24   regard to the inclusion of the Winchester firearm in the

25   guidelines calculation.

1          Ms. Purdy?

2               MS. PURDY:  This is simpler.  The defendant, who I'm

3     sure you are aware, knew all of these guns well.  He only had a

4     relatively small number of them from West Virginia and he knew

5     what guns he had and it was the same guns that, as Mr. Loew

6     correctly characterized, he used as security for loans.  He

7     didn't keep them in his home, but he -- wherever he had them, he

8     had his wife go and get them and pawn them at times and he denies

9     unequivocally he never had a Winchester.  He doesn't like

10    Winchesters.  He wouldn't have bought a Winchester.  He didn't

11    like a Winchester.

12         The only evidence -- and the government has substantial

13    evidence of all of these guns, with the exception of the

14    Winchester.  The only evidence that Mr. Tomblin ever had a

15    Winchester is a -- what's called a 30-day loan contract, which is

16    essentially -- the one we have is almost illegible, but it's from

17    B&B Loans (sic) and it says that this Winchester was pawned --

18               THE COURT:  B&B or Big Eagle?

19               MS. PURDY:  B&B, I believe.  Oh, I'm sorry.  I have the

20    wrong one on top.  Of course, it's Big Eagle, and in terms -- it

21    was the wrong one on top and I was misspeaking and it's not

22    illegible.  It's from Big Eagle Loan & Pawn and it's unsigned.

23    In fact, all of the pawn slips from Big Eagle were unsigned.  I

24    don't know why, but the one I have on top, and the reason I have

25    it here, is because it's from B&B and it had to do with a Glock.

It was provided in the discovery. It's a 30-day standard loan contract exactly like the ones from Big Eagle, but it is clearly signed at the bottom because, otherwise, you don't have a contract.

So whatever Big Eagle is doing with their pawn contracts, not having people sign them, I have no idea, but that with the other guns, all of the other guns, there was evidence that they had been gotten from -- that they had been not only pawned, but they had been gotten from pawn, or someone else had sold them, and there was -- were several different documents that showed that these other guns, all of which Mr. Tomblin acknowledged were his.

The only piece of evidence that ties the Winchester to Mr. Tomblin, which he denied long before I went and looked to see what there was behind it say, "I've never used it. I never would buy it. I wouldn't have one," is this single unsigned loan contract from Big Eagle and so we argue that the Winchester should not be counted against him and that actually would make a difference because it would lower from eight to seven the number of guns for which he is responsible.

THE COURT: Mr. Loew, let's get into the regulatory weeds here a little bit. If a gun is pawned, there's no requirement for a 4473 because the person isn't receiving the gun; they're actually getting rid of it, right?

MR. LOEW: Correct.

1          THE COURT:  So a 4473 wouldn't be generated by the

2    pawning of a gun.

3          MR. LOEW:  Correct.

4          THE COURT:  Now is there not a -- an inventory,

5    required by ATF regulations, that the pawnshop keep a list of the

6    firearms it has on hand?

7          MR. LOEW:  Well, they have what's called an acquisition

8    and disposition book and, when they get a gun in, they enter it

9    onto the "A" side and then, when they get rid of that same gun,

10   they have a corresponding disposition for that very gun.

11      So -- so in this case, in the A&D book, on August 15th of

12   2011, there should be an entry showing "acquired the Winchester"

13   and, if they still have it, the D side, disposition, should be

14   blank.  If they got rid of it to someone, then whoever they got

15   rid of it to, would fill out the 4473.

16         THE COURT:  Did you pull the A&D book?

17         MR. LOEW:  There was a lengthy audit of Big Eagle Gun &

18   Pawn for numerous problems, including horrible recordkeeping, but

19   let me check just one second.

20         MS. PURDY:  It was not in the documents that were

21   provided to us and all the other guns were in there.

22      (Pause.)

23         MR. LOEW:  A couple of things, Your Honor.  The -- Big

24   Eagle's acquisition and disposition book is computerized.  The

25   civil section of ATF that regulates the FFL's has records

regarding their audit, which again, showed so many problems that

they essentially lost their FFL. They got a Cease and Desist

Order. So Big Eagle Gun & Pawn, this shop, is out of business

for selling guns, but I did not get that from the civil side. I

could, I think, but I did not.

MS. PURDY: May I inquire if this is what the A&D book

looks like, a printout? We received in discovery these

printouts, which included all of the other firearms, with the

exception of that one.

THE COURT: So what are you telling me, Mr. Loew? Are

you telling me that you don't have the particular part of the A&D

book that would cover this particular transaction?

MR. LOEW: I -- yes. I don't have that, but ATF Civil,

based on their audit, should have it. I just didn't think about

getting that.

THE COURT: Well, here's where I am on this. We've got

an unsigned form, which I don't think the government has to prove

a contract here, but it's evidence that the gun was pawned, or

it's asserted that the gun was pawned, but Mr. Tomblin's

signature isn't on it. That's not a great piece of evidence.

We -- right now, the only other thing I have is the

defendant's denial through his counsel that he ever had a

Winchester firearm. Now I take that with a grain of salt because

he's got some credibility problems at this point based on my

findings under the obstruction enhancement, but it seems to me

that if this gun appears in the A&D register, then that's probably going to tip the scales in the government's favor. If it doesn't, then I'm not so sure there's enough evidence here to support this particular finding.

So I'm going to suggest that -- I hate to do this, because I really wanted to resolve this matter today, but I'm going to suggest that we take some time and see what's in the record and that's the way my ruling is going to fall, depending on what we find in the records.

Ms. Purdy, do you have any objection to that?

MS. PURDY: I remain concerned about continuing this sentencing, Your Honor. However, I believe it would be to my client's benefit. However, I think it's critical that he get sentenced. So let me talk to him for a moment.

(Pause.)

THE COURT: Ms. Purdy, let me add to this, too, I think that -- believe me, I share your concern about -- about getting this done. I would suggest a time limit within which the government has to produce the -- well, yes, I would suggest a time limit within which the government has to produce the information; say, ten days. Is that doable?

MR. LOEW: Yes. Your Honor, we should be able to do it much faster than that. I mean we may be able to do it this afternoon, if ATF has the records in their office and, if not, they can get them from Logan, I would say, by -- gosh, by

1   Wednesday afternoon.  I mean they either have them or they don't

2   and, if ATF doesn't have them, then Big Eagle either has them or

3   they don't, and we should be able to find that out very quickly.

4           THE COURT:  So I would say we're talking about a

5   continuance of no more than a week to ten days, my schedule

6   permitting.

7           MS. PURDY:  We have no objection to that.  Thank you,

8   Judge.

9           THE COURT:  All right.  I think that's the -- I think

10  that's probably the wisest course of action here and so I'm going

11  to continue this matter.  I'll have to take a look at my calendar

12  to see when I can set it, but it will probably be sometime next

13  week and, in the meantime, I will ask the government to -- if you

14  can locate that, do it as quickly as possible and provide it to

15  counsel and the Court as quickly as possible.

16          MR. LOEW:  And, in providing it to the Court, do you

17  want me to provide it to the probation officer?

18          THE COURT:  Yes, please, although I don't think there's

19  anything for the probation officer to do at this point, but I

20  think so that everybody has the information, I think that's the

21  best way to do it.

22          THE COURT:  Let me -- let me take a look at my calendar

23  and see when we can reschedule this.

24      (Pause.)

25          THE COURT:  I could reconvene this hearing at 10:00

next Tuesday.  Will that work?

MR. LOEW:  What time?

THE COURT:  10:00 on the 21st.

MR. LOEW:  The United States has a sentencing at 9:30, but I've been told by the Court that it's going to be continued. It just hasn't -- I haven't gotten an order yet, but it should be continued.  It's at 9:30 on the 21st.

THE COURT:  Well, I could do 1:30 the same day.  Will that work?

MR. LOEW:  If that sentencing goes forward, it's a two-day sentencing.  So -- it's ridiculous, but 10:00 should be fine.  I'm just -- right now, that sentencing is on Judge Copenhaver's docket, but it should come off.

THE COURT:  Well, the other thing I could do to avoid that whole thing is Monday at 1:30.

MS. PURDY:  That's fine with me, Your Honor.

MR. LOEW:  My schedule next week is really bad, so since I'm very confident that the 21st is not going, I'd rather do it then because I had that all blocked off for that hearing.

THE COURT:  Okay.  All right.  Well, then 10:00 on Tuesday, the 21st.  So that's only -- that's only eight days and we'll take up this hearing where we are today at 10:00 next Tuesday.

Anything else we need to take care of today?

MR. LOEW:  No, Your Honor.

```
 1              MS. PURDY:  Thank you, Your Honor.

 2              THE COURT:  All right.  Thank you.

 3          (Proceedings concluded at 2:19 p.m., May 13, 2013.)

 4

 5   CERTIFICATION:

 6       I, Ayme A. Cochran, Official Court Reporter, certify that

 7   the foregoing is a correct transcript from the record of

 8   proceedings in the matter of United States of America, Plaintiff

 9   v. Terry Tomblin, Defendant, Criminal Action No. 2:10-cr-00130

10   and 2:13-cr-00032, as reported on May 13, 2013.

11

12   s/Ayme A. Cochran, RPR, CRR                   July 24, 2013

13   Ayme A. Cochran, RPR, CRR                          DATE

14

15

16

17

18

19

20

21

22

23

24

25
```